UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TROY D. LEHRE, SR.,                                    Case No. 2:22-cv-00105

          Plaintiff,                                   Hon.  Paul L. Maloney
                                                       U.S. District Judge

     v.

BROCK ARTFITCH, et al,

          Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses Defendants' motion to dismiss or for summary judgment based on qualified immunity. (ECF No. 14.)

This is a civil rights action brought by Plaintiff Troy D. Lehre, Sr., who is the personal representative of the deceased, Troy D. Lehre, Jr.  Plaintiff brings this action pursuant to 42 U.S.C. § 1983 against Michigan State Troopers Hubbard and Artfitch arising out of a traffic stop.  Plaintiff alleges that during a traffic stop of the Lehre vehicle, Defendants violated Troy Lehre's Fourth, Eighth, and Fourteenth Amendment rights by acting with deliberate indifference to his serious medical needs due to a drug overdose.  Plaintiff also asserts a state law claim of gross negligence.

Plaintiff argues that the traffic stop violated Troy Lehre's rights because it exceeded the initial scope of the stop, the purpose of which was to investigate a broken windshield, and resulted in Troy Lehre's detention for over two hours.  Plaintiff

1

asserts that Defendants violated Troy Lehre's Fourth, Eighth, and Fourteenth Amendment rights by not providing medical care to Troy Lehre when he was in medical distress due to an obvious drug overdose.    Plaintiff asserts that instead of summoning emergency medical treatment, the troopers unlawfully detained Troy Lehre on the shoulder of the highway for over two hours.

The record before the Court shows that Trooper Hubbard made the initial stop of the Lehre vehicle due to a cracked windshield.    He quickly learned that the driver, Thomas Lehre, the deceased's brother, had an outstanding warrant.    Hubbard also observed ammunition on the floor of the Lehre vehicle.    Soon after the initial stop, Trooper Artfitch arrived at the scene in a separate patrol vehicle.    While Trooper Hubbard questioned Thomas Lehre in Trooper Hubbard's patrol vehicle, Trooper Artfitch began questioning Troy Lehre.    Most of this questioning occurred in Artfitch's patrol vehicle.    The entire traffic stop, beginning from the moment of the initial stop until Troy Lehre's family members arrived to pick him up at the scene, was videotaped from cameras mounted inside each of the patrol vehicles.    Trooper Hubbard videotaped his interactions, which were mostly with Thomas Lehre, and Trooper Artfitch videotaped his interactions, which were mostly with Troy Lehre.

The video evidence shows that the Troopers were trying to determine if the Lehres had drugs and/or weapons in the vehicle.    Thomas Lehre denied that drugs were in the vehicle and denied knowledge of firearms or ammunition in the vehicle. Troy Lehre admitted that he had attempted to destroy one gram of methamphetamine just before the traffic stop by dissolving it in a sports drink.    Troy

2

Lehre denied that Thomas Lehre, who was a felon, was aware of the 180 rounds of ammunition strewn throughout the vehicle.

It is undisputed that Troy Lehre was under the influence of some type of drug at the time of the traffic stop, despite Troy and his brothers' denials that Troy had taken any drugs, other than Adderall.   The Troopers would not let Troy Lehre drive away on his own, so Trooper Artfitch waited with Troy for his family to arrive to pick him up.   Trooper Artfitch made a statement after Troy Lehre was picked up that Troy was "so high right now, um it is not even funny."   It is clear, however, that there exists no evidence in the record to establish that Troy had swallowed methamphetamine.   At most the evidence in the record shows that Troy was sweating, fidgeting, and that he appeared nervous during the traffic stop.

The video shows that Troy was concerned about charges against himself for possession of methamphetamine, and charges against his brother for being a felon in possession of ammunition.   Troy was told repeatedly by Trooper Artfitch that he was not under arrest and was free to leave once his family arrived.   Most of the conversation that Trooper Artfitch had with Troy was about Troy's interest in becoming a confidential informant and what he might offer as a confidential informant.   Trooper Artfitch told Troy that he would not process any charge against him for possession of methamphetamine while they were working out the confidential informant details.   Troy provided Trooper Artfitch with his phone number and contact information, and Trooper Artfitch gave Troy his business card with instructions to call him with any questions at any time.

Trooper Hubbard had little involvement with Troy Lehre, because his focus was on arresting Thomas Lehre, investigating the ammunition charge against Thomas, and transporting Thomas to Chippewa County due to the outstanding arrest warrant.   Trooper Hubbard was not involved in questioning Troy Lehre.

The undersigned concludes, first, that there exists no genuine issue of material fact to support Troy Lehre's claim that the traffic stop, and search were unreasonable based upon the time it took for his family to arrive on the scene to pick up Troy. Trooper Hubbard learned that Thomas Lehre had an outstanding warrant soon after the initial traffic stop, and Troy Lehre phoned his family to pick him up during the traffic stop because he could not drive due to his intoxication.   The traffic stop was not unreasonably extended by the Troopers.   Thomas was arrested, the vehicle was searched because ammunition was on the floor and throughout the vehicle, and because Troy admitted that he tried to destroy one gram of methamphetamine shortly before the traffic stop.   Once that investigation was concluded, Trooper Artfitch stayed with Troy until his family arrived to pick him up.

Second, Troy was never arrested, was free to go as soon as he could arrange for someone to pick him up and was never in custody.   As such, Troy cannot argue that his constitutional rights were violated, because neither the Fourth, Eighth, or Fourteenth Amendments were implicated by the Trooper's actions.   In the opinion of the undersigned, qualified immunity applies to the Troopers on Plaintiff's constitutional claims.

4

Third, there exists no evidence that could support Plaintiff's claim that the troopers were deliberately indifferent to Troy's serious medical needs during the traffic stop.   Trooper Hubbard had only limited involvement with Troy because he was dealing with Thomas's arrest and investigation of Thomas's knowledge of the ammunition found throughout the Lehre vehicle.

Trooper Artfitch had direct involvement with Troy Lehre and knew he was intoxicated.   Trooper Artfitch's knowledge of Troy's intoxication does not establish that he intentionally disregarded a serious medical risk to Troy or that he recklessly failed to act reasonably to mitigate such a risk.   The video evidence establishes that no genuine issue of material fact exists to support the claim that Trooper Artfitch violated Troy Lehre's constitutional rights.

It is respectfully recommended that the Court grant Defendants' motion for summary judgment based upon qualified immunity.   The Court is not addressing Defendants' motion to dismiss because it is necessary to review all the evidence presented by the parties.

## II.   Facts

### a.  Plaintiff's allegations

On December 19, 2019, the decedent, Troy D. Lehre, Jr., was a passenger in a vehicle driven by his brother, Thomas Lehre.   They were proceeding northbound on Interstate 75 (I-75), south of Mackinaw City, Michigan.   (ECF No. 1, PageID.4.)   At approximately 8:55 am, Michigan State Police Trooper Jacob Hubbard initiated a traffic stop for a cracked windshield.   (*Id.*)   Plaintiff says that, upon making initial

contact with Thomas and Troy Lehre, Trooper Hubbard noted that Troy Lehre "did not look well." (*Id.*) Trooper Brock Artfitch arrived on the scene and both Defendants allegedly observed that Troy Lehre was exhibiting unusual behavior including sweating, trembling hands, constant seat shifting, lack of eye contact, and demonstrating a medical emergency "especially during conversation with" Trooper Artfitch. (*Id.*, PageID.4-5.)

Plaintiff says that Trooper Artfitch asked Troy Lehre to exit the car. (*Id.*, PageID.5.) Troy Lehre consented to a personal search, and during the search he allegedly was sweating, his hands were trembling, and his speech was slow. (*Id.*) Plaintiff says that the Troopers found a bottle of methamphetamine-contaminated liquid when they searched the vehicle. (*Id.*)

Troy Lehre allegedly told Trooper Artfitch that he had dropped one gram of a methamphetamine rock into a half-full bottle of a sports drink that he consumed just before they were pulled over by Trooper Hubbard, and that he snorted two grams of methamphetamine and had one gram remaining. (*Id.*, PageID.5-6.)

Trooper Hubbard informed Troy Lehre, that his brother Thomas Lehre was under arrest, and that Troy Lehre needed to call for a ride home. (*Id.*, PageID.6.) Trooper Hubbard transported Thomas Lehre to Chippewa County. (*Id.*) Plaintiff alleges that Trooper Artfitch continued his investigation with Troy Lehre for over two hours until he finally drove away leaving Troy Lehre on the shoulder of I-75 by himself despite his emergent medical condition that required treatment. (*Id.*, PageID.6-7.) Troy Lehre's family members arrived and immediately took him to the

6

Mackinaw Straits Health Center emergency room because it was obvious that he was overdosing.   (*Id.*, PageID.7.)

While in the emergency room, Troy Lehre went into cardiac arrest and became unresponsive.   (*Id.*)   Troy Lehre was revived following CPR and then transferred to McLaren Hospital – Northern.   (*Id.*)   Unfortunately, Troy Lehre had suffered an extensive brain injury and he remained on life support until his death about two weeks later, on January 2, 2020.   (*Id.*)

Plaintiff filed a two-count complaint.   Plaintiff asserts in Count I that Defendants violated Troy Lehre's Fourth, Eighth, and Fourteenth Amendment rights by failing to provide him with medical care after he exhibited signs of distress and erratic behavior.   (*Id.*, PageID.10.)   Plaintiff says that Troy Lehre had a right to be free from cruel and unusual punishment while being detained, and that Defendants acted with deliberate indifference toward his serious medical condition.   (*Id.*)   Plaintiff asserts a gross negligence claim under Michigan law in Count II.   (*Id.*, PageID.13.)

### b.  Michigan State Police report

The Michigan Department of State Police report, a portion of which is shown below, summarizes the purpose of the traffic stop, Thomas Lehre's arrest, and Troy Lehre's statement that he placed one gram of methamphetamine in sports drink bottle.

## POSSESSION OF METHAMPHETAMINE / FELON IN POSSESSION OF AMMUNITION / DESTRUCTION OF EVIDENCE / FUGITIVE

**SUMMARY:**
I stopped the suspect vehicle for an equipment violation. Further investigation found the driver, Thomas Lehre, to have a warrant out of Chippewa County. Thomas was arrested and transported / lodged to Chippewa County for his warrant. The front seat passenger, Troy Lehre Jr. was interviewed by Tpr. Artfitch, and Troy stated he had destroyed one gram of methamphetamine by putting it inside his sports drink container. Troy was the registered owner of the vehicle and consented to a person search and a vehicle search. The vehicle search discovered ammunition throughout the entire vehicle and the bottle of methamphetamine contaminated liquid. A CCH of Thomas showed that he is a convicted felon.

(ECF No. 15-2, PageID.68.)

A LEIN / SOS check showed that Thomas Lehre had a restricted license and a warrant from Chippewa County for failing to report for substance abuse testing. (*Id.*, PageID.71.)   A check on Troy Lehre showed that he had a valid license with no warrants.   (*Id.*)   Thomas Lehre indicated that there were no drugs inside the vehicle.   (*Id.*, PageID.72.)

Troy Lehre was interviewed at the scene.   The Michigan Department of State Police report, a portion of which is shown below, documented the interview.

**INTERIVEW FRONT SEAT PASSENGER:**
Tpr. Artfitch arrived on scene while I was speaking with Thomas. Tpr. Artfitch contacted Troy, who was still seated in the suspect vehicle's front passenger seat. Troy exhibited unusually nervous behavior: profuse sweating, trembling hands, constant shifting in his seat, and no eye contact during conversation. Tpr. Artfitch asked Troy to exit the car to speak with him further, and Troy did so. He consented to a search of his person, and Tpr. Artfitch located no weapons or contraband on him.

Troy said there were no weapons in the vehicle, but he said there were "a bunch of bullets." He also said there might be a hunting rifle in the car. Troy said his brother "might be" a convicted felon. When asked about drugs, Troy stated that there might be "a Tylenol 3 or something" in the car that "might have fallen in the seat crack." Troy said he was prescribed Tylenol 3 "forever ago." He also added that there "might be a Neurontin" in the car.

When asked about his personal drug use, Troy said he used Adderall that day. He said he last used cocaine or methamphetamine "weeks" ago, last used heroin "years ago," and he has not been sleeping well lately.

Troy said the vehicle is his, and he consented to a vehicle search. Tpr. Artfitch began the search by opening the front passenger door. Right next to Troy's seat on the floor between the seat and the door, Tpr. Artfitch immediately observed a piece of clear plastic baggie that was tied into a knot and was ripped open on one side. The baggie was consistent with a "corner bag" used in narcotics transactions. There was no apparent

8

product inside, as the baggie had been ripped open. The baggie itself was relatively clean and did not appear to be very old. There was no food residue on the baggie.

When asked about the baggie, Troy admitted it had contained "meth." Troy then told Tpr. Artfitch that after they passed Tpr. Hubbard's patrol car on the freeway, Troy panicked and took the approximately one-gram meth rock from the bag and attempted to destroy it by dropping it in a sports drink container. There were two sports drink bottles inside the vehicle-one approximately half full bottle on the front floor immediately between Troy and Thomas and another full bottle on the back seat floor. Troy said he dropped the meth rock in the half-full bottle with no lid between him and Thomas in the front seat. He said he dropped the meth rock directly in the sports drink liquid. Tpr. Artfitch located the bottle where Troy had described and a matching black lid on the ground right at Troy's passenger door. The bottle and its liquid contents were seized (property item #6). Over the course of our roadside investigation, Troy would admit several times that he tried to destroy the meth rock by dropping it in the sports drink. Troy said he paid $150 for the meth.

**INTERVIEW TROY INSIDE TPR. ARTFITCH'S PATROL CAR:**
Tpr. Artfitch invited Troy to sit with him inside patrol car 7042 (Tpr. Artfitch's car) to talk, and Troy stated that he wished to do so. Troy was never handcuffed or restrained in any way. He was repeatedly advised that he would be released and not arrested that day. Tpr. Artfitch advised Troy that he was not under arrest, the patrol car's doors were not locked, and he would be free to go as soon as his ride arrived (Troy had voluntarily called family to pick him up because he said he was too under the influence of drugs to drive). Troy was also informed that Tpr. Artfitch could not make him any promises regarding the final disposition of the investigation. Tpr. Artfitch continued interviewing Troy inside the patrol car while waiting for his family to arrive. The interview was videoed and audio recorded on patrol car 7042's camera system.

Troy said that if he had known dropping the meth rock in a bottle of liquid increases the weight of the methamphetamine, he would have simply swallowed it instead. Troy said he and Thomas left home last night (12/20/19) after work and arrived in Jackson early that morning/last night (12/22/19). Troy said he purchased a total of three grams of methamphetamine from someone in Jackson for $150. He already snorted two grams and had one gram remaining before Tpr. Hubbard stopped him. Troy said he was supposed to get more methamphetamine, but he was "ripped off" both this time and the last time he attempted to purchase methamphetamine in Jackson. Troy said that last night was the first time he had purchased from this dealer, who a "friend" introduced him to. Troy said he snorts his meth. He used to smoke it but his pipe broke.

(*Id.*, PageID.72-73.)

After Troy Lehre admitted that he had destroyed methamphetamine in the car just before the traffic stop, Trooper Hubbard then questioned Thomas Lehre further about narcotics.   Thomas Lehre denied knowledge of Troy using or destroying drugs in the vehicle.   (*Id.*, PageID.74.)   The Troopers searched the vehicle and found over 180 rounds of ammunition in the vehicle.   (*Id.*)

### c.  Michigan State Police videos

Defendants Trooper Hubbard and Trooper Artfitch submitted four videos depicting the events that occurred during the traffic stop.   The videos show that

Trooper Hubbard made the initial traffic stop and that he arrested and transported Thomas Lehre to the Chippewa County line.   The videos show that Trooper Artfitch arrived on scene minutes after the initial traffic stop, that he began questioning Troy Lehre, and that he stayed on site until family members arrived to pick up Troy Lehre and the vehicle.

### 1. Trooper Hubbard's videos

Trooper Hubbard pulled over the Lehre vehicle and approached it.   (Exhibit 5, at 8:54:54.)   Trooper Hubbard requested driver Thomas Lehre to come out of the vehicle and to enter the front seat of his patrol car.   (*Id.*, at 8:56-8:57.)   Thomas indicated that the vehicle was owned by his brother Troy Lehre.   (*Id.*, at 8:57:27.)   Thomas had a restricted driver's license due to a drunk driving infraction.   (*Id.*)   Thomas stated that there was nothing illegal in the vehicle but that he did not know if there was a gun in the vehicle. (*Id.*, at 8:59:40.)   Thomas denied the presence of cocaine or methamphetamine in the vehicle. (*Id.*, at 9:01.)   Trooper Hubbard informed Thomas that there was a failure to appear warrant for his arrest issued from Chippewa County.   (*Id.*)   Thomas agreed with Trooper Hubbard that Troy was not driving because he was tired.   (*Id.*, at 9:06:25.)

Trooper Hubbard removed Thomas from the patrol car and told him he was under arrest.   (*Id.*, at 9:08.50.)   Again, Trooper Hubbard informed Thomas that he was under arrest unless he learned otherwise.   (*Id.*, at 9:17:20.)   Thomas was handcuffed and placed in the front seat of the patrol vehicle.   (*Id.*, at 9:20:30.)   Thomas was allowed to speak with Troy.   (*Id.*, at 9:42:30-9:43:20.)   *Miranda* rights

were read to Thomas.    (*Id.*, at 9:44:30.)    Thomas denied knowledge of ammunition in the vehicle.    (*Id.*, at 9:55.)    Thomas denied that Troy had taken a narcotic.    (*Id.*, at 9:58:30.)    Thomas denied seeing Troy do anything and stated that he did not know if Troy had ever used methamphetamine.    (*Id.*, at 9:59:27.)    Trooper Hubbard advised Thomas that his family should almost be there.    (*Id.*, at 10:05:40.)    Thomas again denied seeing Troy with narcotics and denied seeing ammunition in the vehicle. (*Id.*, at 10:14:20; 10:18:18.)    Trooper Hubbard left the scene of the traffic stop with Thomas and drove him toward Chippewa County.    (*Id.*, at 10:29:10; Exhibit 6, at10:44:20 – 10:55:21.)

### 2.  Trooper Artfitch's videos

Trooper Artfitch arrived at the scene about eleven minutes after Trooper Hubbard's traffic stop.    (Exhibit 3, at 9:06:16.)    An off camera conversation can be heard between Trooper Artfitch and Troy Lehre.    Trooper Artfitch asked whether narcotics and weapons may be inside the Lehre vehicle.    (*Id.*, at 9:06:40.)    Trooper Artfitch stated that Troy Lehre seemed "more nervous than normal."    (*Id.*, at 9:11:53.)    Troy indicated that he might have Tylenol 3 in the vehicle.    (*Id.*, at 9:13:36.)    Troy denied having cocaine or methamphetamine in the vehicle.    (*Id.*, at 9:14:10.)    Trooper Artifitch told Troy that if he only had a small amount of cocaine or methamphetamine in the vehicle, he would "let you be on your way."    (*Id.*)    Troy stated that he last used cocaine a week ago.    (*Id.*, at 9:14:20.)    Troy stated that he did not have heroin or needles in the vehicle and last used heroin years ago.    (*Id.*, at 9:13:50.)

Troopers Artfitch and Hubbard spoke to each other.   (*Id.*, at 9:17.)   Trooper Artfitch began his vehicle search and continued to ask Troy questions.   (*Id.*, at 9:17:50.)   Trooper Artfitch asked how much Troy put in the liquid and Troy responded that he put in "maybe one gram."   (*Id.*, at 9:22:12 – 9:23:10.)   Trooper Artfitch stated that he wants to finish the search and then they will talk, because good options existed, especially for a first offense.   (*Id.*, at 9:25.)   Trooper Artfitch stated that at this point, it was just possession of meth.   (*Id.*, at 9:31:50.)   Trooper Artfitch stated "that if you have meth in there you do not want to be drinking it, right?"   (*Id.*, at 9:34:57.)

Troy is observed walking back toward Trooper Artfitch's patrol car and he stopped to speak with Thomas who was sitting in the front passenger seat of Trooper Hubbard's patrol vehicle.   (*Id.*, at 9:46.)

Trooper Artfitch switched to the interior camera view in his vehicle and Troy sat in the front passenger seat. (*Id.*, at 9:47:06.)   Trooper Artfitch informed Troy that he was not under arrest, the doors were not locked, and he was free to leave as soon as his family arrived to pick him up.   (*Id.*, at 9:47:37.)   Trooper Artfitch informed Troy that the liquid meth would be sent to the lab for testing and the prosecutor will decide what to do next. (*Id.*, at 9:47:50.)   After Troy stated that he should have swallowed the meth, Trooper Artfitch asked him if he ever had swallowed meth and Troy responds negatively.   (*Id.*, at 9:49:20.)   Trooper Artfitch told Troy that swallowing meth is not worth the health or safety risks.   (*Id.*)

Trooper Artfitch asked Troy if he would consider becoming a confidential informant.  (*Id.*, at 9:53:30.)  Trooper Artfitch turned the heat down because Troy was sweating.  (*Id.*, at 9:53:40.)  Trooper Artfitch noticed that Troy is "super nervous" and tells him that "you got to chill."  (*Id.*, at 9:54:10.)  There was a discussion about possible meth, coke, or crack buys, and Troy stated that he purchased three grams of meth in Jackson, Michigan.  (*Id.*, at 9:55 – 956:24.)

Trooper Hubbard appeared at the driver's side of the vehicle and told Trooper Artfitch that Thomas was facing a four-year felony due to the ammunition and firearm.  Troy responded that "he [his brother Thomas] didn't know about that though."  (*Id.*, at 9:56:50.)  Trooper Artfitch told Trooper Hubbard that they need the ammunition to charge him.  (*Id.*, at 9:57:20.)  Troy referred to his brother Thomas and stated that "he didn't know about anything."  (*Id.*, at 9:57:29.)

Trooper Artfitch and Troy continue to discuss drug buys and Troy indicated that he had snorted meth the previous evening and had taken some coke two weeks ago.  (*Id.*, at 9:57:29; 10:00; 10:31.)  Trooper Artfitch asked Troy what he was worried about right now and if there was anything that he could do to calm Troy down.  (*Id.*, at 10:01:46.)  Troy agreed that he was nervous because of the situation, and due to the weight of the liquid.  (*Id.*, at 10:01:46.)  Trooper Artfitch and Trooper Hubbard spoke to each other, and Trooper Artfitch stated that Troy had been super cooperative and had two people coming to get him because he took Adderall and was not comfortable driving.  (*Id.*, at 10:04:56.)  Troy telephoned his family members to determine their arrival time.  (*Id.*, at 10:05:20.)  While Troy spoke on his cell phone,

Trooper Artfitch told Trooper Hubbard that he was almost done with Troy, and he wanted to hold off charging him so he could get him to cooperate as a CI.   (*Id.*, at 10:07:10.)   Trooper Artfitch told Trooper Hubbard that he wanted to finish the conversation because "I am on a roll."   (*Id.*)   Trooper Artfitch told Trooper Hubbard that Troy put one gram of meth into half a bottle of liquid.   (*Id.*, at 10:05:03.)

Trooper Artfitch asked Troy to verify his address and telephone number. (Exhibit 4, at 10:10.)   They discussed the possibility of Troy becoming a confidential informant.   (*Id.*, 10:10:50.)   Troy stated that he did not know who the dealer is "down there" and that product in the Upper Peninsula costs too much and is never good.   (*Id.*, 10:11:30 – 10:12:20.)   Trooper Artfitch told Troy that he will not submit a report until they work out the confidential informant details.   (*Id.*, 10:13.)   Troy asked who had called the Troopers about him, and Trooper Artfitch told Troy that no one called, they just stopped the vehicle, because they "literally stop everything." (*Id.*, 10:13:33.)   Troy gave Trooper Artfitch his girlfriend's telephone number.   (*Id.*, 10:14:17.)   Trooper Artfitch told Troy that he would hold off bringing charges against Troy based upon whether the confidential informant relationship worked out.   (*Id.*, 10:14:30.)   Trooper Artfitch warned Troy that if he failed to respond to future calls, he would send a team out to arrest Troy.   (*Id.*, 10:15:11.)   Troy then gave Trooper Artfitch his parents' address.   (*Id.*, 10:15:54.)   Trooper Artfitch gave Troy his business card and told Troy that he could telephone him anytime.   (*Id.*, 10:16:55.) Trooper Artfitch told Troy that someone would telephone him and provide him options.   (*Id.*, 10:19.)

Troy stated that he cannot buy in the Upper Peninsula but that he could make purchases in Jackson.  (*Id.*, 10:19:40.)  Trooper Artfitch stated that he was not pushing charges at this time, and they would take this slow.  (*Id.*, 10:19:50.) Trooper Artfitch stated that he needed to get the ammo out of the car, and both Trooper Artfitch and Troy exited the patrol vehicle.  (*Id.*, 10:30:45 – 10:21:50.) After the Lehre vehicle was searched, Trooper Artfitch returned to the patrol vehicle and told Troy that he can either stay outside or inside the vehicle because they were just waiting for Troy's ride.  (*Id.*, 10:30:45.)  Troy stayed outside the vehicle and Artfitch told Troy that he had documented everything regarding the ammo and that the prosecuting attorney would decide what to do with Thomas.  (*Id.* 10:31:50 – 10:32:10.)

Trooper Artfitch then rolled up the passenger side window and phoned a detective to discuss the possibility of Troy becoming a confidential informant.  (*Id.*, 10:33:07.)  The detective suggested that there were more drugs in the vehicle because no one would travel from the U.P. to Jackson to buy only $30.00 worth of meth.  (*Id.*, 10:36.)  Troy entered the vehicle to speak with the detective and informed Trooper Artfitch that his family would be there to pick him up shortly.  (*Id.*, 10:36:24.)  Troy explained to the detective that he intended to buy ten grams of meth, but he was ripped off and only received three grams of meth.  (*Id.*, 10:37:10.)  Troy denied that he has more meth.  (*Id.*, 10:38.)  Troy stated that he was owed fourteen- and one-half grams of meth.  (Id., 10:38:19.)  Troy wiped his forehead and explained that in the past he had returned with a lot of meth but not in the last couple of

months.   (*Id.*, 10:38:50 – 10:39:15.)   Troy stated that twenty-eight grams is the most he had ever purchased.   (*Id.*, 10:39:39.)   He explained that he just needed to get high.   (*Id.*, 10:40:50.)

The detective instructed Troy to show Trooper Artfitch his phone messages for verification that Troy was being truthful.   (*Id.*, 10:41.)   Troy gave his phone to Trooper Artfitch who verified the messages.   (*Id.*, 10:46:30.)   The detective stated that he wanted to speak with Troy when he was not stressed out, tired, or under the influence.   (*Id.*, 10:47:47.)

Troy stated that he did not have more meth in his vehicle, but he acknowledged that his drug dealer could have hidden more meth somewhere inside the vehicle. (*Id.*, 10:48:30.)   After Trooper Artfitch responded by stating that made no sense, Troy stated "I thought he called you guys to get me into trouble."   (*Id.*, 10:48:30.)   Trooper Artfitch asked whether he needed to call in a dog (referring to a narcotics detection canine).   (*Id.*, 10:48:50.)   Troy stated that he got ripped off this time and the time before.   (*Id.*, 10:50:40.)   Troy wiped his face with his sweatshirt.   (*Id.*, 10:52.)

Trooper Artfitch told Troy not to tell anyone that they had found dope in his car if he was going to be a confidential informant.   (*Id.*, 10:53.)   Troy asked if Trooper Artfitch called the dog in yet.   Troy stated he would be willing to pull all the panels in the car.   (*Id.*, 10:53:34.)   Troy wiped his forehead with his sweatshirt and drank from his sports drink.   (*Id.*, 10:57 – 10:57:30.)   Trooper Artfitch told Troy that he would not tow his vehicle.   (*Id.*, 10:57:54.)   When Troy's family arrived to pick

him up, Trooper Artfitch and Troy exited the patrol vehicle.  (*Id.*, 11:00:06 – 11:00:36.)

Trooper Artfitch returned to his patrol vehicle and reported "clear stop here." (*Id.*, 11:01:43.)  Trooper Artfitch made a speaker phone call and stated: "He's gone now.  Um, oh hold on, let me turn off my camera real quick.  He, uh, yeah, dude, he is so high right now, um it is not even funny."  (*Id.*, 11:04.)

### III.  Motion Standards

Defendants filed a motion to dismiss or alternatively a motion for summary judgment.  The Federal Rules provide that a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein."  *Id.*  Both parties rely on the State Trooper reports and the videos made at the time of the traffic stop.  The Complaint does not refer to the reports or the video evidence.  When matters outside the pleadings are considered by the Court, the motion must be treated as one for summary judgment.  Fed. R. Civ P. 12(d).  Therefore, only Defendants' request for summary judgment is considered in this R&R.

17

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).   The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).   The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).   Defendants have moved for qualified immunity.

## IV.   Qualified Immunity

Defendants argue that they are entitled to dismissal of the complaint against them based upon qualified immunity.   "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the

defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The analysis entails a two-step inquiry.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).  First, the court must "determine if the facts alleged make out a violation of a constitutional right."  *Id.*  (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)).  Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."  *Id.* (citing *Pearson*, 555 U.S. at 232).  A court may address these steps in any order.  *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied.  *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  The court considers the state of the law at the second step.  As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  As explained by the Supreme Court:

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

In the qualified immunity context, if the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate. *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir.

2020) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)).

## V.   Unlawful search and seizure – Fourth Amendment

Plaintiff says that Defendants violated Troy Lehre's Fourth Amendment right against unreasonable search and seizure because the traffic stop became unreasonable due to the passage of time.[1]   A police officer's stop and detention of a motorist is a seizure under the Fourth Amendment.   *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012).   Plaintiff argues that the traffic stop became a detention resulting in the arrest of Troy Lehre's brother, and Troy Lehre's unlawful detention for over two hours.   (ECF No. 23, PageID.120.)

The Fourth Amendment states:

[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

[2] no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.   The first clause, the Reasonableness Clause, provides an overriding check on criminal investigations by the government, prohibiting all "unreasonable searches and seizures."   *Soldal v. Cook County*, 506 U.S. 56, 63, (1992); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).   The second

---

[1]   Although, Plaintiff did not raise a Fourth Amendment unreasonable search claim in his complaint, it appears that the parties are arguing this issue in their briefs. (*See*, *e.g.*, ECF No. 15, PageID.59 (asserting that "Plaintiff's Fourth Amendment claim is not viable") and ECF No. 23, PageID.119-120 (asserting that "an unreasonable extension of a traffic stop constitutes a violation of the Fourth Amendment.")

clause of the Amendment, the Warrant Clause, sets forth the process for obtaining a warrant to authorize a search.  *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987); *United States v. Leon*, 468 U.S. 897, 914 (1984).

Plaintiff cites to *Rodriguez v. United States*, 575 U.S. 348 (2015), for the proposition that the Fourth Amendment is violated when an officer extends the duration of a traffic stop to investigate matters unrelated to the initial stop.   A traffic stop involves "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 355.   The objective of a traffic stop is to ensure that the vehicle on the road is operating safely and responsibly.  *Id.*  Checking a passenger for warrants and brief questioning is a permissible purpose of a traffic stop. *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020).

Plaintiff argues that this was more than a routine traffic stop.   (ECF No. 23, PageID.120) (asserting that "[t]his was not a traffic stop; this was a detention, especially given Troy's condition and his brother's arrest from the scene.")   Indeed, Officer Artfitch admitted to Troy Lehre that they were looking for reasons to pull vehicles over to find illegal weapons or drugs.   "It is well established, however, that police officers may stop a vehicle that commits a traffic violation and look for evidence of a crime, even if the traffic stop is merely a pretext and they do not have independent reasonable suspicion of criminal activity."  *Id.* at 257.   Nevertheless, under a Fourth Amendment analysis, an officer's subjective intent is generally immaterial.  *Id.*  The question is whether the traffic stop was extended beyond a

22

reasonable time necessary to effectuate the purpose of the traffic stop. *Id.* An officer may extend a traffic stop beyond the scope of what was originally permissible if there exists articulable reasonable "suspicion that criminal activity is afoot" based upon something that occurred after the initial stop.[2] *Stepp*, 680 F.3d at 661 ("under the principles set forth in *Terry v. Ohio,* 392 U.S. 1 (1968) . . . . If the stop was proper, we ask 'whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'"). "The bar is low. Reasonable suspicion requires only that the officer have 'a moderate chance' of finding evidence of illegality on further investigation." *United States v. Williams*, 22-1024/1038, slip op. at 5 (6th Cir., May 17, 2023).

The Lehre vehicle was pulled over by Trooper Hubbard because it had a cracked windshield. It is undisputed that the traffic stop was justified by the equipment violation. The cracked windshield provided reasonable suspicion for the traffic stop. *Weaver v. Shadoan*, 340 F.3d 398, 407-408 (6th Cir. 2003) (concluding that traffic stop was proper because officer had reasonable suspicion that registration was not properly displayed because it was behind a darkly tinted window).

After the initial traffic stop, Trooper Hubbard discovered additional information to extend the traffic stop beyond the initial purpose of the stop. Trooper

---

[2]   Although not present here, facts obtained from a confidential informant prior to a traffic stop may also provide articulable reasonable suspicion for an officer to extend the length of a traffic stop. *United States v. Salas*, 820 F. App'x. 405, 413 (6th Cir. 2020).

Hubbard learned that Thomas Lehre had an outstanding arrest warrant within minutes of the traffic stop.    Trooper Hubbard learned that Thomas Lehre was a felon and had observed that there was ammunition in the vehicle, which raised the possibility of a felony charge against Thomas Lehre.    After Trooper Artfitch arrived at the scene, he observed ammunition in the car and discovered that Troy Lehre had attempted to destroy one gram of methamphetamine by dissolving it in the liquid remaining in one of his sport drinks.    It is undisputed that both Thomas and Troy Lehre consented to the searches of their person and their vehicle.    Troy Lehre admitted that he was not in condition to drive himself and the Troopers were waiting for Troy Lehre's family members to arrive at the scene to pick up Troy and to take the Lehre vehicle.    Thus, there existed several reasons for the Trooper to extend the traffic stop beyond the initial purpose of the stop.

In the opinion of the undersigned, Defendants are entitled to qualified immunity with respect to the Plaintiff's alleged Fourth Amendment violation for extending the traffic stop.    The Plaintiff has failed to adduce facts that create a genuine issue of material fact as to the validity of the traffic stop and its length. Here, the undersigned concludes that the evidence before the court fails to indicate a genuine issue of material fact as a violation of a constitutional right.    Thus, Plaintiff has failed on the first prong on the qualified immunity analysis.    Moreover, Plaintiff has failed to show that the right at issue was "clearly established" when the event occurred such that a reasonable officer would have known that his conduct violated it.

## VI.    Failure to provide medical care – Fourth, Eighth, and Fourteenth Amendments

As noted above, Troy Lehre's family took him to the hospital after they picked him up at the scene of the traffic stop.    Plaintiff says that Defendants violated the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution by failing to provide Troy Lehre with medical care.

Plaintiff is essentially making two separate arguments that each rely upon a violation of the Fourteenth Amendment.    First, Plaintiff argues that Troy Lehre should be treated in the same manner as a pretrial detainee under the Fourteenth Amendment.    (ECF No. 23, PageID.118.)    Plaintiff argues that the Troopers had a constitutional obligation to not act with deliberate indifference toward Troy's serious medical needs.    (*Id.*)    Second, Plaintiff argues that Troy Lehre's substantive due process rights under the Fourteenth Amendment were violated when the Troopers placed him in danger, because he was not allowed to leave the scene of the traffic stop until his family arrived.    (ECF No. 23, PageID.119.)    Plaintiff argues that this restraint of freedom required the Troopers to provide Troy Lehre with medical care. (*Id.*)

"Generally, there is no constitutional right to adequate medical care for individuals who are not in the custody of the state."    *Linden v. Southfield*, 2023 WL 4758817, *2 (6th Cir. July 23, 2023) (*citing Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) ("it is not a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need.")).    "It is true that in certain limited circumstances the Constitution imposed upon the State affirmative duties of

25

care and protection with respect to particular individuals." *DeShaney v. Winnebago County*, 489 U.S. 189, 198 (1989).   Under a substantive due process theory, those instances could include a state actor's affirmative act that creates or increases the risk of private acts of violence or cuts off private sources of rescue without providing an adequate alternative.   *Linden*, at **2-5 (affirming dismissal based upon alternative ground of qualified immunity under these theories because no clearly established law was violated).

The Eighth Amendment protections include the right to be free from cruel and unusual punishment, which includes the requirement that officials not be deliberately indifferent to a prisoner's serious medical needs.   *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).   And, further, this right is extended to pretrial detainees pursuant to the Fourteenth Amendment.   *Whitley v. Albers*, 475 U.S. 312, 327 (1986).   "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney*, 489 U.S. at 200.   "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restrain of personal liberty—which is the 'deprivation of liberty'

triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.*

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes and requires prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle,* 429 U.S. at 103–04. The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). Because Troy Lehre was not incarcerated or convicted of a crime, the Eighth Amendment's protection against deliberate indifference to the serious needs of a prisoner are not directly applicable. *Watkins v. Battle Creek*, 273 F.3d. 682, 685 (6th Cir. 2001).

The Eighth Amendments protections extend to pretrial detainees through the Fourteenth Amendment's Due Process Clause. *Whitley*, 475 U.S. at 327. Until recently, the Eighth Amendment deliberate indifference objective and subjective standards applied to pretrial detainees bringing medical care claims through the Fourteenth Amendment. In *Richmond v. Huq et al.*, 885 F.3d 928 (6th Cir. 2018), the Sixth Circuit reserved deciding whether, in the context of a failure to provide medical care, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), eliminated the requirement of proving the subjective prong of the deliberate indifference test for pretrial detainees under the Fourteenth Amendment. In *Brawner v. Scott Cnty., Tennesee,* 14 F.4th at 585, 597 (6th Cir. 2021), the Sixth Circuit found that under the

27

subjective component of the deliberate indifference analysis, a pretrial detainee only needed to show recklessness – "more than negligence but less then subjective intent – something akin to reckless disregard."   *Id.* (citation omitted).

In *Greene v. Crawford County*, 22 F.4th 593 (6th Cir., 2022), the Sixth Circuit clarified that a pretrial detainee establishes the subjective standard by showing a defendant either intentionally ignored a serious medical need or recklessly failed to act reasonably to mitigate the risk posed by a serious medical need.   *Id.* at 607.

To satisfy the objective component of a deliberate indifference claim the Eighth Amendment standard still applies.   A pretrial detainee must allege that the medical need at issue is sufficiently serious.   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In other words, the pretrial detainee must show that he is incarcerated under conditions posing a substantial risk of serious harm.   *Id.*   For a pretrial detainee to survive summary judgment on a deliberate indifference claim, he must "present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serous medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" the detainee."   *Greene*, at 607, citing *Brawner*, 14 F.4th at 597.

Troy Lehre was not a pretrial detainee.   He was never charged with a crime, and he was never placed in a jail setting.   That is undisputed.   Plaintiff argues that he should be treated legally in the same manner as a pretrial detainee because Troy

Lehre was not free to leave during the traffic stop and was detained by the Troopers for over two hours.   (ECF No. 23, PageID.105.)   But Plaintiff has not cited a case that supports his theory that he should be treated in the same manner as a pretrial detainee would be treated.   Plaintiff has not shown that the Fourteenth Amendment as applied to pretrial detainees is applicable under these facts.   *See*, *Vaughn v. Wilson*, 2023 WL 2721002 (E.D. Mich., Mar. 30, 2023) (granting qualified immunity to arresting officers who suspected that the decedent swallowed crack cocaine despite his denials, because Plaintiff failed to identify a decision from the Supreme Court, a published Sixth Circuit opinion, or one from any other circuit court that established that the deputies conduct amounted to a denial of adequate medical care).

Nevertheless, whether Plaintiff's claim could rise to an alleged constitutional violation under the Substantive Due Process Clause of the Fourteenth Amendment, as opposed to an obligation under state law, is dependent on whether Plaintiff can establish that Defendants violated clearly established law.   Plaintiff argues that the Troopers created or exposed Troy Lehre to a danger that he otherwise would not have faced or left him in a situation that was more dangerous than the one in which they had found him.   (ECF No. 23, PageID.119 (*citing DeShaney* and *Patel v. Kent School District*, 648 F.3d 965, 973 (9th Cir. 2011).) "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."   *DeShaney*, 489 U.S. at 200.

In the opinion of the undesigned, the traffic stop was not extended beyond the time necessary under the circumstances.   Trooper Hubbard made a traffic stop that was equivalent legally to a *Terry* stop to investigate ongoing criminal activity. Trooper Hubbard determined that the Lehre vehicle was unsafe to drive.   After he pulled over the Lehre vehicle, he quickly learned of the arrest warrant and suspected other criminal activities based upon observations of ammunition strewn throughout the vehicle.   But that was only the beginning.   The traffic stop was extended for four main reasons:   first, because of the existence of an outstanding warrant for Thomas Lehre's arrest; second because a significant amount of ammunition was strewn all over the Lehre vehicle and Thomas Lehre was a felon with the possibility of being charged with possession of ammunition.   The first and second reasons, caused Thomas Lehre to be arrested and detained by Trooper Hubbard.

The third and fourth reasons apply directly to Troy Lehre, but neither caused him to be detained by Trooper Artfitch.   The third reason for the extension of the stop was because Troy Lehre admitted that he had methamphetamine in the vehicle that he attempted to destroy by dissolving one gram in his sports drink.   The fourth reason was because Troy Lehre told Trooper Artfitch he took Adderall and was unable to drive.   It is also clear that Trooper Artfitch was aware that Troy was intoxicated and unable to drive.   As a result, Trooper Artfitch could not simply let Troy Lehre drive away or walk away down Interstate 75.   Instead, Troy Lehre telephoned family

members to come and pick him up.[3]   Trooper Artfitch waited along the side of the interstate with Troy until his family members arrived.

Trooper Artfitch repeatedly told Troy that he was not under arrest and that he was free to go as soon as a member of his family arrived to pick him up and to drive his vehicle.   Trooper Artfitch's discussion with Troy regarding the possibility of Troy becoming a confidential informant did not change the fact that Troy was free to leave as soon as a family member arrived to drive him away.   Troy voluntarily answered Trooper Artfitch's questions and seemed willing to explore the option of being a confidential informant.   Troy also tried to convince Trooper Artfitch that his brother Thomas had no idea that Troy had ammunition in the vehicle.   Troy left the scene of the traffic stop immediately after his family members arrived to pick him up.[4] Under these circumstances, Troy was not in custody and the length of time that Troy was waiting for the arrival of his family members was not due to any action by the Troopers.   Importantly, the Troopers actions during the traffic stop did not create any danger to Troy.   It is important to note that Troy denied that he took methamphetamine, and further denied that he had swallowed methamphetamine.

---

[3]     Troy Lehre had access to his cell phone during the entire traffic stop and he made cell phone calls during the traffic stop and while waiting for his family to arrive.
[4]     The complaint says that Trooper Artfitch "simply drove away leaving him [Troy Lehre] on the shoulder of I-75 by himself, while undergoing a medical episode that required emergency treatment."   (ECF No. 1, PageID.7, ¶ 27.)   This is false, and the undisputed record establishes that Trooper Artfitch stayed with Troy Lehre until his family members arrived to pick him up.   The fact that Trooper Artfitch stayed with Troy Lehre until his family members had arrived is the basis for Plaintiff's argument that the traffic stop extended unconstitutionally beyond the time that was necessary to complete the *Terry* stop.

(Exhibit 3.)   In addition, Thomas denied that Troy had taken any drugs or that drugs were in the vehicle.   Neither Trooper had any knowledge that Troy may have swallowed methamphetamine.[5]

Moreover, even if Plaintiff could establish that the troopers restricted Troy's freedom in a manner that arguably implicated a requirement to provide medical care, it is respectfully recommended that the Court find that Defendants are entitled to qualified immunity.   The body of Sixth Circuit precedent supports this conclusion.

In *Watkins*, 273 F.3d 682, police executed a search warrant on an apartment. When police entered the apartment, Watkins was exiting a walk-in closet, where police found a torn plastic bag with white crumbs and a larger piece identified as crack cocaine.   *Id.* at 684.   Police officers handcuffed Watkins and noticed him licking his lips and a pink foamy drool coming from his mouth.   *Id.*   Officers asked Watkins if he had swallowed any drugs and explained that if he had, they would take him to the hospital because he could die.   *Id.*   Watkins denied that he swallowed drugs.   *Id.*   Officers took Watkins to the jail but did not inform jail personnel that Watkins had swallowed any drugs.   *Id.*   When he appeared drunk or high, jail personnel asked Watkins if he had swallowed drugs or drank alcohol.   *Id.* at 684-

---

[5]     The complaint says that Troy Lehre had swallowed methamphetamine.   (ECF No. 1, PageID.5, at ¶ 20, states that "he dropped approximately one gram of methamphetamine rock into a half-full bottle sports drink liquid, and then drank it just before they were pulled over. . . .")   Nothing within the record supports that conclusion.   But more importantly, the record shows that the Troopers had no knowledge that Troy Lehre might have swallowed methamphetamine.

685.  Watkins continued to deny that he had swallowed drugs.  *Id.* at 685.  Jail officials later discovered that Watkins died in his cell.  *Id.*

The court concluded that no genuine issue of fact existed on the question of deliberate indifference.  *Id.* at 686.  The Court found that Watkin's repeated denial that he had swallowed drugs, even after he was advised that the officers would seek medical attention for him if he had swallowed drugs and that he would not face any additional charges, failed to demonstrate a question of fact on the issue of whether the officers should have known that Watkins had swallowed drugs.  *Id.*  The Court dismissed the claims asserted by Watkin's estate, including claims under the Eighth and Fourteenth Amendments.  *Id.*

In *Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003), Weaver's vehicle was pulled over, and he apparently consented to a search of the vehicle.  Weaver was acting nervously, and a pat-down search revealed a lump in his pocket which the officer believed was five or six rocks of cocaine.  *Id.* at 402.  Weaver told the officer it was a wad of paper, but when the officer asked him to empty his pockets, Weaver ran away from the scene, with officers in pursuit.  *Id.*  After he was caught and handcuffed, the officers searched him but found no drugs.  *Id.*  When Weaver was placed in the police vehicle, officers noticed that he had something in his mouth, but Weaver refused to open his mouth.  *Id.*  An officer attempted to open Weaver's mouth, but he appeared to swallow something.  *Id.*  Officers retraced Weaver's footsteps and discovered a cellophane wrapper that appeared to contain crack cocaine residue.  *Id.*  Subsequent lab tests failed to identify the substance as crack cocaine.

While being transported to the jail, Weaver began having a seizure and slumped over in his seat. *Id.* Paramedics were called to the police station approximately an hour and half after Weaver was in custody. *Id.* at 403. The officers did not observe Weaver ingest any drugs, but paramedics were called to determine whether Weaver was overdosing from drugs that he may have taken. *Id.* Weaver refused treatment and stated he had not taken or ingested any drugs. *Id.* Weaver was told that there were serious consequences to ingesting drugs, including death. *Id.* at 404. After being in custody for almost two hours, Weaver began experiencing symptoms of illness, he was mumbling, and he could not walk. *Id.* Approximately an hour later, Weaver was pronounced dead. *Id.* at 405.

The Sixth Circuit reversed the finding of the district court and concluded that the officers were entitled to qualified immunity on plaintiff's claims under the Fourth, Eighth, and Fourteenth Amendments. "Plaintiff's contention that the Officers 'believed' or 'should have known' that Weaver had swallowed drugs does not give rise to a deliberate indifference claim," because the officers did not observe him swallow drugs and did not have a subjective belief that Weaver had overdosed. *Id.* at 411.

An officer's lack of knowledge that a pretrial detainee had ingested drugs does not necessarily insulate the officer from a deliberate indifference cause of action. *Burwell v. Lansing*, 7 F. 4th 456, 473-474 (6th Cir. 2021). For example, a jailer was not entitled to qualified immunity where he observed a pretrial detainee unconscious in a pool of his own blood and rendered no aid, despite his lack of knowledge that the pretrial detainee had previously ingested drugs. *Id.* at 472. An officer may be

liable when he witnesses a detainee in obvious distress and fails to provide medical care after being alerted to a serious medical need. *Id.* at 475. "[I]t was clearly established at the time of Phillip's detention that declining to render aid to an unconscious detainee lying in a pool of vomit constitutes a constitutional violation." *Id.*

The Sixth Circuit has "routinely assigned liability to officers who witnessed a detainee in obvious distress." *Id.* at 474. Knowledge that an individual took drugs or was intoxicated is not equivalent to knowledge that the individual is in obvious distress. As the Sixth Circuit explained:

> In some overdose cases, we have held that the defendant's lack of knowledge that the decedent had ingested drugs meant that the plaintiff could not satisfy the subjective component. That knowledge was necessary because "a pretrial detainee's generalized state of intoxication, without more, is insufficient to establish . . . an officer's deliberate indifference to a substantial risk of serious harm to a detainee." *Border*, 414 F. App.x [831] at 837 [(6th Cir. 2011)]. As intoxicated behavior alone will not suffice, evidence that the officers knew that a detainee had ingested drugs may be necessary to prove subjective awareness of a risk of harm because, without that critical piece of information, there might be "no reason to believe that there was any type of medical emergency." *Border*, 414 F. App'x at 837 . . . .

*Id.* at 473.

In *Border*, the decedent showed obvious signs of intoxication at the arrest scene. "Border was visibly intoxicated, his face was pale, his eyes were glazed, his speech was slurred, he had difficulty maintaining balance, and he had poor coordination." 414 Fed Appx. at 831. Another witness told the officers that Border was under the influence. *Id.* The video at the time of arrest showed that Border appeared intoxicated or very tired and appeared to nod off multiple times. Border

35

could hold an intelligent conversation with the officer, but there was no conversation regarding medication.  *Id*. at 832.    At the jail, Border denied that he drank or ingested anything.  *Id*.   The Sixth Circuit affirmed the lower court's decision to deny qualified immunity to a jail booking officer who had altered jail intake records fifteen months after he had booked Border into the jail.   That officer changed the record to state that Border entered the jail under the influence of "barbiturates, heroin, or other drugs."  *Id*. at 834, 836-837.   The Court concluded that by originally withholding this information, a reasonable public official would have been aware that he was not entitled to qualified immunity as a matter of law.    *Id*.

In the opinion of the undersigned, Trooper Hubbard is entitled to qualified immunity.   Trooper Hubbard had limited contact with Troy Lehre.   Trooper Hubbard was focused on Thomas Lehre.   Trooper Hubbard arrested Thomas Lehre on an outstanding warrant, questioned Thomas Lehre in his patrol car, and gathered evidence – ammunition from Lehre vehicle – to support further felony charges against Thomas.   In the opinion of the undersigned, no genuine issue of material fact exists that could show that Trooper Hubbard violated any of Troy Lehre's clearly established constitutional rights.   The totality of the evidence in this case shows that Trooper Hubbard is entitled to the defense of qualified immunity because he did not violate clearly established law.

While Trooper Hubbard was dealing with Thomas Lehre, Trooper Artfitch was with Troy Lehre.   Trooper Artfitch questioned Troy Lehre, searched the Lehre vehicle while Troy Lehre was near the vehicle, discussed with Troy the option of

becoming a confidential informant, and stayed with Troy at the scene of the traffic stop until Troy's family arrived to drive him away.   It is undisputed that Trooper Artfitch was aware that Troy Lehre was intoxicated.   He admitted that knowledge by making the comment "he is so high right now, um it is not even funny."   (Ex. 4., at 11:04.)

Despite the fact that Trooper Artfitch was aware that Troy Lehre was "high," there exists no factual evidence in the record which could support a conclusion that Trooper Artfitch possessed knowledge that Troy Lehre faced an imminent medical emergency.   Troy told Trooper Artfitch that he had taken Adderall and did not feel comfortable driving.   Troy stated that he had last used two grams of methamphetamine the night before and that he had not taken any other drugs that day.   Troy indicated that he had purchased a total of three grams of methamphetamine and that he dissolved the remaining one gram in a sport drink bottle just before the traffic stop to destroy the drug.   Troy denied swallowing any methamphetamine and Thomas denied that Troy had taken any drugs.

Troy was cooperative, he continued to answer Trooper Artfitch's questions, and he engaged in conversation with Trooper Artfitch.   When he spoke with the detective over the phone, he was responsive and was able to explain why he only had three grams of methamphetamine despite driving the long distance from the U.P. to Jackson, Michigan, to purchase the drug.

In the opinion of the undersigned, there exists no evidence to sustain the inference that Trooper Artfitch should have known that Troy's level of intoxication

presented a serious medical need and that he intentionally disregarded that risk or that he recklessly failed to act reasonably to mitigate that risk.   *Greene*, at 607. There exists no evidence which could sustain an inference that Trooper Artfitch created or exposed Troy to any danger or placed him at a greater risk of danger. *Linden,* at **2-5.   For these reasons, it is respectfully recommended that the Court find that genuine issues of material fact do not exist which could establish that Troy Lehre's constitutional rights were violated and that Troopers Hubbard and Artfitch are entitled to the defense of qualified immunity.   In addition, Defendants are entitled to summary judgment based upon qualified immunity because Lehre has failed to point "to legal authority that clearly shows that the constitutional question in this case should be resolved in his favor."   *Linden*, at *4.   In other words, Plaintiff has failed to establish that Defendants violated clearly established constitutional law.

### VII.   Gross negligence

Plaintiff also argues that the Troopers were grossly negligent under Michigan law.   In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).   Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.*   Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF*

*Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

If the Court adopts the undersigned's recommendation, it will dismiss each of Lehre's federal claims.   The balance of the relevant considerations would therefore weigh against the exercise of supplemental jurisdiction.   As such, it is respectfully recommended that the Court decline to exercise supplemental jurisdiction.

## VIII.   Recommendation

It is respectfully recommended that the Court grant Trooper Hubbard and Artfitch's motion for summary judgment by concluding that the troopers are entitled to qualified immunity from liability on the federal claims alleged.   It is further recommended that the Court deny supplemental jurisdiction over Plaintiff's state law gross negligence claim.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:    August 8, 2023                              /s/ *Maarten Vermaat*
                                                                  MAARTEN VERMAAT
                                                                  U.S. MAGISTRATE JUDGE